## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GREGORY HAYES,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:06-cv-339-JHH** |
| **THE HARTFORD LIFE** | ) | |
| **INSURANCE COMPANY,** | | |
| **d/b/a Benefit Management** | ) | |
| **Services,** | | |
| | ) | |
| **DEFENDANT.** | | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the court are Plaintiff's Motion (doc. #18) for Summary Judgment filed January 17, 2007 and the Motion (doc. #20) for Summary Judgment by Hartford Life and Accident Insurance Company ("Hartford") filed January 17, 2007.  Plaintiff filed his Complaint (doc. #1) in this court on February 21, 2006, seeking reinstatement of disability benefits pursuant to a long term disability insurance policy insured by Hartford.  (See generally Compl.).

On January 17, 2007, Plaintiff filed his motion (doc. #18) for summary judgment, brief (doc. #22) in support thereof, and evidentiary submission (docs. #24-27).  On the same date, Hartford filed its motion (doc. #20) for summary judgment,

brief (doc. #21) in support thereof, and evidentiary submission (doc. #23).  Both parties have filed responsive pleadings (docs. #33-34, 39-40) and evidence in support thereof (docs. # 35-38).

In addressing the parties' competing summary judgment motions, this court must determine which standard of review applies and decide whether plaintiff is entitled to ERISA benefits as a matter of law.[1]  As discussed more fully below, the court finds that Hartford's motion (doc. #20) for summary judgment is due to be granted and plaintiff's motion (doc. #18) for summary judgment is due to be denied.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate

---

[1] Because the court's role in ERISA cases is more akin to an appellate one, the scope of its review on summary judgment is notably different than when it sits as a trial court.  See Providence v. Hartford Life & Accident Ins. Co., 357 F. Supp.2d 1341, 1342 n. 1 (M.D. Fla. 2005) ("[T]he Court's task is to review the benefit decision based on the administrative record available to the decision maker at the time he or she made the decision.").

the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could [find] for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law.  See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S., 224 F.2d 338, 345 (5th Cir. 1955); see also Matter of Lanting, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996).  The court will consider each motion independently, and in accordance with the Rule 56 standard.  See Matsushita Elec. Indus. Ltd. v. Zenith

Radio Corp., 475 U.S. 574, 587-88 (1986).  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." See WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 at 327-28 (3d ed. 1998).  Also, these are the facts for summary judgment purposes only; they may not be the actual facts.  See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.'") (internal citation omitted).

## III.   STATEMENT OF FACTS

### A.   Introduction and Plan Provisions

Hartford issued a long term disability ("LTD") policy, GLT-024554 (the "Policy") to Wal-Mart Stores, Inc., to insure the long term disability component of the employee welfare benefit plan established and maintained by Wal-Mart Stores. (Aff. at ¶ 3.)   The Policy includes and incorporates a Certificate of Insurance ("Certificate") also referred to as a Booklet-certificate.  (Id. at ¶ 4.)

Hartford is vested with full discretionary authority to construe and interpret the terms of the Policy and determine eligibility for benefits thereunder.  (Administrative

Record ["AR"] at 919.)  Under the Policy, "total disability" is defined as follows:[2]

> (1) During the Elimination Period; and
> (2) for the next 12 months, you are prevented by:
>> (a) accidental bodily injury;
>> (b) sickness;
>> (c) mental illness;
>> (d) substance abuse; or
>> (e) pregnancy,
>
> from performing the essential duties of your occupation, and as a result you are earning less than 40% of your pre-disability earnings, unless engaged in a program of Rehabilitative Employment approved by us. After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training, or experience.  "Your occupation" includes similar job positions with the employer which may be offered to you, with the rate of pay 60% or higher than your indexed, pre-disability earnings.

(AR at 918.)

The claimant is responsible for providing on-going proof of disability or benefits will terminate.  In relevant part, the Policy states:

> The Hartford will pay benefits until the first to occur of:
>> (1) the date you are not longer Disabled;
>> (2) the date you fail to furnish proof that you are continuously Disabled;
>> (3) the date you refuse to be examined, if the Hartford requires an examination . . .

(AR at 949.)

_____

[2] The Policy's definition of "total disability" shifted in October 1997.  Prior to this time, "total disability" was determined based upon plaintiff's inability to perform his own occupation. (See doc. #21 at 32, n.4.)

5

**B.     Plaintiff's Disability Claim**

**1.  Introduction**

Plaintiff, Gregory Hayes, attended school through the 10th Grade.  (AR at 164.)
Thereafter he worked as a truck driver, delivering mobile homes from factory to
dealer lots.  (AR at 225.)  In 1989, he began working for Wal-Mart as a truck driver
throughout the Southeast in an approximate 500-mile radius from Cullman, Alabama.
(AR at 224-25.)  On July 8, 1996, he suffered injury to his back while rolling a dolly
on a trailer at a Wal-Mart vendor location.  (AR at 405, 672.)

On his application for LTD benefits, plaintiff stated he had a 10th grade
education.  (AR at 671.)  Dr. David Brase, an orthopedist, completed an Attending
Physician's Statement of Disability, listing plaintiff's primary diagnoses as lumbar
radiculopathy and degenerative disc disease.  (AR at 677-78.)  By letter dated
September 19, 1996, Hayes' claim for LTD benefits was approved pursuant to the
policy, effective October 8, 1996.  (AR at 93, 660-61.)  In that letter, Hayes was
informed that benefits would remain payable after 12 months only if he was "unable
to perform the duties of any occupation for which you are qualified based on previous
training, education, and experience."  (AR at 660-61.)

As the pain worsened, Hayes was referred to Dr. Charles Clark, a neurologist,
who performed back surgery in August 1997.  (AR at 572-73, 582.)  Immediately

following the surgery, Dr. Clark recommended that Hayes be off work for two to three months.  (AR at 583.)  Several months following the surgery, an MRI on Hayes' back revealed low intensity sclerosis at the L5-S1 level which "could represent a spur formation that is causing some compression upon the right exiting nerve root at the L5-S1 level."  (AR at 557.)  Otherwise, the scan was normal showing no acute herniated discs and a normal fusion at the site of the lumbar discs where the surgery was performed.  (Id.)  Upon review of the MRI, Dr. Clark extended plaintiff's driving restriction for another month but released Hayes back to work effective October 18, 1998, with the restrictions of no prolonged bending, stooping, climbing, or sitting and a 25 pound weight lifting restriction.  (AR at 542, 555.)  Hayes did attempt to return back to work, but found that he "could not stand it;" he has not worked since November 1998.  (AR at 530.)

In February 1999, Hayes underwent a Functional Capacity Evaluation ("FCE") at Dr. Clark's request.  (AR at 530-37.)  Hayes reported to the therapist that he could perform the activities of daily living, smoked two packs of cigarettes a day, and was able to drive the approximate one hour trip to the appointment but experienced increased pain thereafter.  (AR at 530.)  The FCE summary demonstrated that Hayes could lift up to 15 pounds, occasionally sit, stand, reach overhead, squat, bend, climb stairs, climb ladders and crawl.  (AR at 537.)  He could frequently walk and kneel and

there were no activities he was unable to perform.  (Id.)  Overall, Hayes scored 125% on the assessment of whole body range of motion, where 100% was the industrial norm.  (AR at 536.)

Upon his March 1999 review of the FCE findings, Dr. Clark concluded that Hayes was unable to perform any duty that required prolonged sitting (such as a truck driver) but stated no other restrictions or limitations.  (AR at 540.)  "I think he has reached [maximum medical improvement] as of today.  We will plan on seeing him back only on an as needed basis."  (AR at 540.)

Thereafter, Hayes' medical care was referred to Dr. Sandra Durham with the Lighthouse Pain Clinic for chronic pain management.  (AR at 518.)  In July 2000, Hayes reported to Dr. Durham that the medication helped him tremendously and allowed him to remain active and get out in the yard and walk.  (AR at 517.) However, in November 2001, Hayes experienced increased pain, and his dosage of OxyContin was increased; thereafter Hayes reported a feeling of stability and a desire to maintain the dosage.  (AR at 509.)  Medical records note no problems with cognitive functioning as a result of the increased dosage.  (Id.)

In February 2002, Hartford requested an updated attending physician statement and claimant questionnaire from Hayes.  (AR at 457.)  In response thereto, Dr. Cosgrove, an anesthesiologist, submitted a statement of disability listing primary

diagnoses as degenerative lumbar disc disease and failed back surgery syndrome. (AR at 448-49, 453.)  However, Dr. Cosgrove declined to comment on plaintiff's physical restrictions, stating instead that Hayes needed an updated FCE.  (AR at 448-49.) Records from Dr. Cosgrove indicate that Hayes met with him every four months to maintain medications of Lortab and Klonopin.[3]  (AR at 386.)

On March 13, 2003 Hartford notified Hayes by letter that it would be commencing an investigation to determine whether he would qualify under the "any occupation" definition of disability.  (AR at 377-78.)  "Please be advised that we are continuing your LTD benefits in order to avoid a financial hardship on you as we have not completed our investigation.  The payment of benefits beyond 10/7/97 is not to be construed as an admission of further liability on your claim.  We reserve all rights and defenses available to us under the policy, and waive none."  (Id.)

## 2.     The "Any Occupation" Investigation

In conjunction with the "any occupation" investigation, Hartford sent Hayes a claimant questionnaire.  In response to the question regarding his current medical condition, Hayes referred to his August 1997 surgery on his back and Dr. Brase's 1996 restriction of no lifting over ten pounds.  (AR at 371.)  At the same time, Dr.

---

[3] Dr. Cosgrove's notes reveal that Hayes took the Klonopin sporadically while the Lortab benefitted him greatly.  (AR at 385.)

Cosgrove completed another Attending Physician Statement.  (AR at 363-68.)  Dr.

Cosgrove listed plaintiff's primary diagnosis as degenerative disc disease – lumbar

and failed back surgery syndrome.  (AR at 368.)  He further stated that plaintiff's

condition was treated with medication but declined to provide restrictions or

limitations, indicating that an updated FCE should be completed.  (Id.)

An in-house nurse with Hartford agreed that plaintiff should undergo a FCE.

(AR at 354.)  Although one was scheduled for June 2003, it was never completed

because of plaintiff's high blood pressure.[4]  (AR at 346, 350-53.)  Thereafter, on June

23 and 24, 2003, Hartford conducted video surveillance of plaintiff.  (AR at 724-28

and Video.)  The investigative report regarding the video states:

> while bent over, with his chest parallel with the ground, he picks up the
> ice and throws it forcefully to the ground again.  During this action the
> subject shows no physical signs of pain or caution.  The subject picks up
> the bag with both hands, stands without hesitation and walks to the back
> of the truck where he transfers the bag to the right hand.  He puts the ice
> in the bed of the truck then reaches into the bed with both arms, standing
> on his tiptoes.  The subject appears to open the ice bag and empty its
> contents into another container.

(AR at 727-28 and Video.)

Hartford then scheduled Hayes for an independent medical examination

("IME") in Decatur, Alabama for August 28, 2003.  (AR at 342.)  Plaintiff did not

---

[4] Hayes' internist refused to treat the high blood pressure with medication.  (AR at 346.)

appear for this appointment, despite a letter from Hartford informing him that "failure to attend the examination may result in immediate termination of your benefits." (AR at 741.)  Therefore, Hartford requested independent physician Dr. William Sniger, board certified in physical medicine and rehabilitation, review plaintiff's medical records (through 3/21/03) and surveillance video.  (AR at 323-27.)  Upon review, Dr. Sniger noted that several of plaintiff's physicians recorded plaintiff's normal gait and station and motor strength since the 1997 surgery, and concluded that Hayes was capable of performing sedentary to light work on a full time basis.  (AR at 327.)

On December 10, 2003, a Hartford representative conducted an in-person continuing disability interview with plaintiff, which lasted approximately an hour and a half.  (AR at 765.)  Hayes represented during the interview that he was: (1) able to walk approximately 100 yards before pain in lower back, hips, and both legs rises to level 10; (2) able to stand for approximately 10 minutes before pain escalates to level 10, has to immediately sit down or he will fall down; (3) able to lift and carry items that weigh 10 pounds (for example, a gallon of milk from car to house); (4) not able to bend at the waist without experiencing pain to level 5; would collapse if tried to bend forward at the waist; (5) not able to twist at the waist without experiencing pain to a level 4 or 5; (6) not able to squat or kneel without experiencing pain to a level 4 or 5; (7) not able to keep his balance; (8) has full use of his hands and fingers

11

although his grip strength is poor; (9) can sleep approximately 8 hours a night but only in 2 to 3 hour segments; (10) does not have any computer skills; (11) can drive approximately one hour before experiencing pain to a level 8 in back, legs and hips, easier to ride in a car than drive himself; (12) able to sit one hour before experiencing pain to a level 8 in lower back, hips, and legs, must get up and walk about before he can sit back down.  (AR at 767-69.)  Hayes stated that he was prevented "from returning to my own or any occupation because I experience too many bad days and I experience chronic back, hip and leg pain to a level 10.  I can not lift and carry anything over 10 pounds in weight.  I can not stand, sit or walk for extended periods of time."  (AR at 770.)  When shown the video surveillance tape, Hayes acknowledged that it accurately depicted his level of functionality but commented that he has to go about living his life.  (AR at 771.)  Upon conclusion of the interview, the interviewer noted "Mr. Hayes did not complain of pain and he did not display any objective symptoms of pain during the time I spent with him.  Mr. Hayes was able to walk to and from our table with a normal gait and without difficulty.  Mr. Hayes never lost his balance when he arose from the table after sitting in the same chair for over an hour and a half."  (AR at 765.)

In February 2004, a Vocational Rehabilitation Clinical Case Manager for Hartford, Larry Underwood, performed an employability analysis of Hayes.  (AR at

309.) Underwood's conclusion identified three alternative unskilled occupations that Hayes could perform, taking into account his physical limitations and educational background – loading inspector, truck safety inspector, and perishable freight inspector.  (AR at 244, 309.)

- Loading Inspector: as per D.O.T., the occupational physical demands include but are not limited to climbing, balancing, stooping, kneeling, crouching, crawling, and other activities.  Prolonged static posture would not be expected to occur in the performance of this occupation.  By D.O.T. definition walking/standing to a significant degree would be involved.  Completion of paperwork/reports would require some sitting.  The walking/standing and sitting required would likely eliminate prolonged static posture positions.  (AR at 140.)

  This position also requires general educational development:

    - Reasoning: Grades 7-8
    - Mathematics: Grades 4-6
    - Language: Grades 7-8

  (AR at 251.)

- Safety Inspector: as per D.O.T. the occupational physical demands include stooping, kneeling, crouching, and crawling.  Prolonged static posture would not be expected to occur in the performance of this occupation.  By D.O.T. definition walking/standing to a significant degree would be involved.  Completion of paperwork/reports would require some sitting.  The walking/standing and sitting required would likely eliminate prolonged static posture situations.  (AR at 140.)

  This position also requires general educational development:

    - Reasoning: Grades 7-8
    - Mathematics: Grades 4-6

13

•      Language: Grades 4-6

(AR at 261.)

•     Perishable-Freight Inspector: as per D.O.T., walking/standing to a significant degree would be involved. Completion of paperwork/reports would require some sitting. The walking/standing and sitting required would likely eliminate prolonged static posture situations. (AR at 140.)

This position also requires general educational development:
•     Reasoning: Grades 7-8
•     Mathematics: Grades 4-6
•     Language: Grades 7-8

(AR at 264.)

Hartford then requested an updated evaluation from Dr. William Sniger. (AR at 891.) In response thereto, Dr. Sniger stated "it remains my medical opinion that the claimant has the functional capacity to perform sedentary to light work on a full-time basis." (Id.)

Dr. Sniger also contacted Dr. Cosgrove regarding the positions identified by Underwood. (AR at 307, 887-90.) Dr. Cosgrove again responded that he would require a FCE to be performed before providing further comment. (AR at 894-95.) However, additional medical records were submitted by Dr. Cosgrove at this time, indicating that Hayes continued to experience left lower extremity pain but yet ambulated with a "fairly normal gait and station." (Id.) Moreover, "examination of the thoracolumar spine is essentially unchanged from previous," "there is no

significant tenderness on deep palpation," "range of motion is fair in all planes with

pain provoked on the extremes of range of motion," and "lower extremities – normal

for power and tone."  (Id.)  Because Hayes was complaining of increased pain in his

left leg, Dr. Cosgrove scheduled him for an MRI.  (AR at 301.)  The MRI indicated

inflammation but no definite disc herniation or spinal stenosis.  (AR at 306.)

Hartford then scheduled Hayes for an orthopedic independent medical

examination ("IME") in June 2004 with Dr. Larry Parker.  (AR at 82-83, 790.)  After

a physical examination and reviews of the original FCE, vocational report, and

history, Dr. Parker concluded that Hayes was capable of working in a "light to

sedentary" occupational setting.  (AR at 287.)  Dr. Parker did not identify any

occupation that fell within that range, but did note "[r]easonable restrictions and

limitations for plaintiff would include restriction from prolonged sitting or repetitive

bending and lifting with a general lifting restriction of 30 pounds occasionally and

10 pounds regularly."  (AR at 287-88.)  Dr. Parker also noted that Hayes "did not

display or reveal any significant symptoms of symptom magnification, job

dissatisfaction or secondary gain during his history or physical examination."  (AR

at 287.)

Hartford requested Dr. Cosgrove's comments on the decision that Hayes was

capable of performing sedentary to light work.  Dr. Cosgrove refused to comment,

instead once again stating that he would need to see an updated FCE in addition to the job description of any potential jobs slated for Hayes.  (AR at 272-73.)

Hartford informed Hayes by letter dated August 24, 2004 that his LTD benefits would be terminated effective August 31, 2004 because "to continue to receive benefits, you must be disabled . . . according to the LTD policy language."  (AR at 76-78.)  The letter stated that in contrast to the policy definition of disability, "the functionality you demonstrated during the surveillance and the results of the MAG review indicated you possess work capacity.  The Independent Medical Evaluation results indicate you have the capacity to perform light duty work . . . an Employability Analysis report indicated you have transferrable skills to perform several occupations which meet policy requirements."  (AR at 80-81, 236-41.)

### 3.    The Appeal

Hayes appealed this decision by letter dated February 17, 2005.  (AR at 183-84.)  The appeal included the following supplemental information: a letter from the primary treating physician, Dr. David Cosgrove, the FCE performed at Dr. Cosgrove's request by HealthSouth, and a vocational evaluation performed by Thomas Elliott concerning the analysis of the medical information taken together with other tests to determine whether Hayes had the ability of performing any occupation. (Id.)

16

The January 13, 2005 FCE completed by Dr. Beck and submitted on appeal made the following work restriction recommendations:

- Standing: one-half hour at a time.  The patient may resume activity if he has the opportunity to change positions for five to ten minutes.

- Walking: one-half hour at a time.  The patient may resume activity if he has the opportunity to change positions for five to ten minutes.

- Sitting: up to two hours at a time.  The patient may resume activity if he has the opportunity to change positions for five to ten minutes.

- Lifting: occasional lift 20 pounds, frequent lift 15 pounds.

- Climbing: no restrictions.

- Balancing: no restrictions.

- Stooping: occasional.

- Twisting: occasional.

- Kneeling: no restrictions.

- Crouching: occasional.

- Squatting: occasional.

- Reaching, handling, and fingering: no restrictions.

(AR at 198-99.)  The February 11, 2005 letter from Dr. Cosgrove submitted on appeal advised that he generally agreed with the FCE, with the exception that Hayes should not perform climbing, balancing, and/or kneeling at work.  (AR at 194.)  Moreover,

Dr. Cosgrove's letter dispelled concerns about Hayes' medications, stating: "Based upon the patient's office visits and discussions concerning side effects of his current medication regimen, it would appear he does not suffer significant problems in these areas.  Formal cognitive testing could be performed during both the presence and absence of the medication to confirm this observation, but it is likely not necessary." (Id.)

Also attached to the appeal letter was a vocational evaluation performed by Thomas Elliott, Licensed Professional Counselor, Rehabilitation and Vocational Expert, Registered Psychometrist on February 14, 2005.  (AR at 224-32.)  Elliott made the following conclusions:

- Hayes continues with a Commercial Driver's License and went to the Bradford Treatment Center for alcohol problems.  (AR at 224, 228-29.)

- With the administration of the Wechsler Abbreviated Scale of Intelligence, Mr. Hayes obtained a verbal I.Q. of 77, performance I.Q. of 86, and full scale I.Q. of 79.  These results place him within the upper limits of the borderline range of intellectual functioning, and at the 8th percentile rank.  At the 90% confidence level, his full scale I.Q. would range from 76-83.

- With the administration of the reading portion of the Wide Range Achievement Test, Third Edition, he obtained a standard score of 70 which falls within the borderline range, consistent with his intellect.  He is currently reading at 4th grade level of ability.

- The restrictions of the FCE preclude his ability to perform any of his past relevant work or any work to which acquired skills would be

transferrable.

- His intellectual and educational background limit him to unskilled to no greater than low-end semi-skilled work, the vast majority of which is physically demanding and/or is production based work set in industrial or factory setting.

- Mr. Hayes is considered to have a 100% vocational disability rating.

- He is not capable of performing any occupation to which he is otherwise qualified to perform on the basis of education, training, and work experience.

(AR at 229-30.)

Armed with this additional information, Hartford continued the appeals process. As part thereof, Hartford requested a peer review through the University Disability Consortium. (AR at 175-77.) Dr. Barry Turner, a board certified doctor in orthopedic surgery, reviewed the IME results, the January 2005 FCE results, the video surveillance, and Dr. Sniger's peer review report. (AR at 171.) Turner concluded:

- Low back pain with degenerative disc disease. There is no evidence of herniated disc, nerve root compression, myelopathy or radiculopathy.

- The two functional capacity evaluations suggested the capability of doing light work in high correlation to the surveillance video.

- There is no evidence that he has any significant impairment whatsoever and no reason that he could not perform sedentary or light duty level work full-time without further restrictions and limitations.

19

- Examination findings are essentially normal.

- Dr. Cosgrove noted that the claimant could be cognitively impaired as a result of medications that he takes, however, there is no evidence in any of the records that I reviewed where he complains of being cognitively impaired from medications and no one has reported objective findings, especially of the FCE noting that he was cognitively impaired while performing FCE testing. Thus, there does not appear to be any merit in the allegation of impairment as a result of medications.

- I have no hesitation to recommend that he is capable of performing light full-time duty work without further restrictions and limitations as long as he remains at that level of labor and has the ability to change positions at will and as necessary.

(AR at 131-32.)  Hartford followed up with this peer review report by requesting its vocational counselor, Larry Underwood, to again revisit plaintiff's employability report. (AR at 167.)  Underwood again identified three occupations for which Hayes was qualified – loading inspector, safety inspector, and perishable freight inspector. (AR at 166.)  Underwood noted that each of the three occupations required both walking/standing and sitting, and concluded that the varied physical requirements would likely eliminate prolonged static posture situations.  (Id.)

Hayes' appeal of the long term disability decision was submitted to Corey Welch, appeals specialist. (Welch Dep. at 5-6, 11, 19-20.) Welch reviewed all of the information in the file and agreed with the finding of Underwood that Hayes was qualified and able to perform the positions of loading inspector, truck safety

inspector, and perishable freight inspector.[5]   (Welch Dep. at 33-34.)   Welch

performed no independent testing on Hayes' reading, mathematics, and reasoning

skills, instead relying on Underwood's vocational report and employability analysis.

(Welch Dep. at 44, 46-47, 52.)

By letter dated March 16, 2005, Hartford notified Hayes that the decision to

terminate LTD benefits was upheld on appeal.  (AR at 64-67.)  The letter addressed

each new piece of information that Hayes had submitted on appeal, particularly

addressing the vocational report by Elliott.  (AR at 65.)

> You provided a 2/16/05 vocational report by Elliott MA, CRC which concluded in part "on the basis of this evaluation with the adverse profile of an individual of age 45 who has not worked in any capacity since the Fall of 1998; limited education; no GED or vocational training; marginal reading skills; borderline intellect; past relevant work history entirely that of a truck driver; medical history of lumbar fusion with continuing radiculopathy and back pain; significant work restrictions that preclude his past work or any work to which acquired skills would be transferrable; need to frequently change postural positions; and continuing significant levels of pain, Mr. Hayes is considered to have a 100% vocational disability rating."

(Id.)  Hartford responded to the findings of Elliott by stating: "our employability

analysis determined he [plaintiff] is qualified for several occupations based on the

information in our file including his medical status, his demonstrated employment

---

[5] Hartford uses the national economy to make the employability analysis.  (Welch Dep. at 54.)  Location is not a factor.  (Welch Dep. at 54-55.)

history, and his education level.  We do not agree that Mr. Hayes' work restrictions

preclude all work.  Please also note that Mr. Hayes attended school to the 10th grade.

The occupations we identified for him require only 7th to 8th grade reasoning,

mathematics, and language abilities."  (AR at 65.)

The final decision of Hartford denying continuing long term disability benefits

is now under review.

## IV.   FRAMEWORK OF ANALYSIS

### A.   Three Levels of Scrutiny

The Eleventh Circuit has articulated three different levels of scrutiny in suits

involving benefits denials by the administrator of an ERISA plan.  See, e.g., Shaw v.

Conn. Gen. Life Ins. Co., 353 F.3d 1276, 1282 (11th Cir. 2003).   First, in

circumstances where the plan does not vest the administrator with discretion to

determine eligibility for benefits or to construe the terms of the plan, the court

reviews the denial decision de novo.  See Firestone Tire & Rubber Co. v. Bruch, 489

U.S. 101, 115 (1989).  Second, where the terms of the plan provide the administrator

with such discretion, its decision to deny benefits is, as a general matter, afforded

substantial deference and subjected to an "arbitrary and capricious" standard of

review.  See Brown v. Blue Cross & Blue Shield of Ala., 898 F.2d 1556, 1558 n.1

(11th Cir. 1990).

However, where a plan administrator, vested with discretion, has a conflict of interest,[6] this deferential review is adjusted, and a third standard of review is employed.   See id. at 1566-67.  That standard is one of "heightened" arbitrary and capricious review, and affords the administrator's decision to appreciably less deference than it would receive absent the conflict of interest.  Id.  This "heightened" level of scrutiny applies regardless of whether the dispute in question turns on a question of fact, or on the proper construction to be given the plan.  See Torres v. Pittston Co., 346 F.3d 1324, 1329 (11th Cir. 2003).

Here, the parties agree that Hartford was both vested with discretion under the plan and suffered from a conflict of interest.  (See Doc. #21 at 27-30; see also Doc. #22 at 14-15 and Doc. #33 at 12.)  As such, it is undisputed that the "heightened" arbitrary and capricious standard applies.

## B.   Heightened Arbitrary and Capricious Review

Under the "heightened" arbitrary and capricious standard of review, the court must apply three steps.[7]  First, under *de novo* review, the court determines whether

---

[6] A plan administrator has a conflict of interest where it retains control over the decision-making process, and also pays the relevant benefits out of its own funds.  See Brown, 898 F.2d 1556 at 1566-67.

[7] Although the Eleventh Circuit has articulated the steps in several different ways, see, e.g., Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004) (integrating

the decision to deny benefits was "wrong." Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004). A decision is "wrong" when the court disagrees with it. See id. If it is not "wrong," then the administrator prevails. Id. If the court determines that the decision was "wrong," however, it goes to the second step and determines whether the decision was nevertheless reasonable. Id. A decision is reasonable when "there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1139 (11th Cir. 1989). If the court determines that the administrator's decision was both "wrong" and not reasonable, then the claimant prevails. Williams, 373 F.3d at 1138.

A more difficult situation arises, however, when the administrator's decision to deny benefits is "wrong," but nevertheless reasonable. Were the decision to be subjected only to an arbitrary and capricious standard of review, it would be entitled to deference, and the administrator would prevail. Id. Under the "heightened" arbitrary and capricious standard, however, something more is required before the administrator may escape liability. See id. The Eleventh Circuit has not decided

_____

steps to determine proper level of scrutiny with remainder of "test," arriving at six-prong analytical framework), where the parties agree that the administrator both possessed discretion in denying benefits and suffered from a conflict of interest, only three steps are needed to resolve the claimant's case.

what that "something" is.  See id.

In Brown v. Blue Cross & Blue Shield of Alabama, where the Eleventh Circuit

first articulated the parameters of the "heightened" arbitrary and capricious standard,

the Eleventh Circuit held

> that when a plan beneficiary demonstrates a substantial conflict of
> interest on the part of the fiduciary responsible for benefits
> determinations, the burden shifts to the fiduciary to prove that its
> interpretation of plan provisions committed to its discretion was not
> tainted by self-interest. That is, a wrong but apparently reasonable
> interpretation is arbitrary and capricious if it advances the conflicting
> interest of the fiduciary at the expense of the affected beneficiary or
> beneficiaries unless the fiduciary justifies the interpretation on the
> ground of its benefit to the class of all participants and beneficiaries.

898 F.2d at 1566-67.  As the above indicates, however, Brown dealt with a dispute

where the issue was the proper interpretation to be given the plan itself.  See id.  Later

Eleventh Circuit decisions stated that Brown's "heightened" arbitrary and capricious

standard of review applied equally to challenges to an administrator's factual

determinations.  See, e.g., Torres, 346 F.3d at 1329.  Such decisions did not, however,

address the mechanics of the heightened standard to challenges of an administrator's

factual conclusions.

In Williams v. BellSouth Telecommunications, Inc., however, the Eleventh

Circuit reflected on earlier decisions which seemingly applied the "heightened"

arbitrary and capricious standard in the context of factual challenges to an

administrator's denial of benefits. 373 F.3d at 1138-39. Although acknowledging the apparent application of the <u>Brown</u> test in these cases, the Eleventh Circuit emphasized that it "did not say whether <u>Brown</u>'s 'heightened arbitrary and capricious,' burden-shifting approach should be applied to factual determination cases like this." <u>Id.</u> at 1139. The Eleventh Circuit, however, declined to articulate an alternative formulation of the "heightened" arbitrary and capricious standard to be applied in factual determination cases, because the case before it did not require the Court to get to that step. <u>Id.</u>  Instead, the Court "le[ft] the issue for another day." <u>Id.</u>

## V.   APPLICATION

### A.   Was Hartford's Decision Denying Benefits Wrong When Reviewed On A *De Novo* Basis?

Under <u>Williams</u>, the court's initial task is to review, on a *de novo* basis, whether Hartford's decision to deny plaintiff's claim for disability benefits based on the "any occupation" definition of disability was correct.  This first step calls for the court to decide whether it agrees or disagrees with the claim administrator's benefits-denial decision.  If the court determines that the administrator's decision is correct, then summary judgment is due to be entered in favor of Hartford and no further inquiry is necessary.

1.   <u>There is no dispute that Hayes' medical condition allows him to</u>
<u>perform sedentary/light work.</u>

"The plaintiff does not disagree with defendant that simply based upon medical evidence [Hayes] is qualified physically for 'light duty' work." (Doc. #32 at 16, 19; <u>see</u> <u>also</u> Doc. #40 at 3.)  In fact, all of the medical evidence available in this case indicates that Hayes, from a purely medical standpoint, is able to work.

- Dr. Clark, the neurologist who performed back surgery on plaintiff in August 1997, released Hayes back to work with the restrictions of no prolonged bending, stooping, climbing, or sitting and a 25 pound weight lifting restriction.  (AR at 542, 555.)

- The FCE results from February 1999 revealed that Hayes could lift up to 15 pounds, occasionally sit, stand, reach overhead, squat, bend, climb stairs, climb ladders, and crawl.  The FCE also demonstrated that Hayes could frequently walk and kneel, and that there were no activities he was unable to perform.  (AR at 537.)

- Dr. Clark reviewed the February 1999 FCE and concluded that Hayes was unable to perform any duty that required prolonged sitting (such as a truck driver) but stated no other restrictions or limitations.  (AR at 540.)

- Medical records from the Lighthouse Pain Clinic indicate no problems with cognitive functioning as a result of pain medication.  (AR at 509.)

- Video surveillance of Hayes in 2003 revealed his ability to bend over, with his chest parallel to the ground, pick up a bag of ice, and throw it forcefully to the ground.  (AR at 727-28.)

27

- Independent physician Dr. William Sniger reviewed Hayes' medical records and surveillance video, and concluded that Hayes was capable of performing sedentary to light work on a full-time basis.  (AR at 327.)

- In February 2004, Hartford's vocational rehabilitation case manager identified three positions which Hayes would be medically capable of performing: loading inspector, safety inspector, and perishable freight inspector.  (AR at 166, 244, 309.)

- Dr. Sniger performed an updated evaluation, concluding "it remains my medical opinion that the claimant has the functional capacity to perform light work on a full-time basis." (AR at 891.)

- Dr. Larry Parker, an independent medical examiner, performed an orthopedic IME on Hayes in June 2004 and concluded that Hayes was capable of working in a "light to sedentary" occupational setting.  (AR at 287.)

- Dr. Cosgrove never claimed Hayes was totally disabled, instead repeatedly stating his need for an updated FCE.  (AR at 194, 198.)

- The FCE results from January 2005, submitted by the plaintiff on appeal, suggest that if given the opportunity to change position, plaintiff can lift up to twenty pounds at a time, sit for up to two hours at a time, and stand and walk for one-half hour at a time. (AR at 196.)

- Dr. Cosgrove reviewed the results of the January 2005 FCE and generally agreed with it, but stated that Hayes should not perform climbing, balancing, and/or kneeling at work.  (AR at 194.)  The same review noted that Hayes' pain medications likely did not interfere with his cognitive reasoning.  (Id.)

- The vocational opinion of Thomas Elliott states that plaintiff has the ability to perform "unskilled to no greater than low-end semi-

28

skilled work," while at the same time noting that the "vast majority" of these types of jobs are physically demanding and/or is production based work set in industrial or factory setting. (AR at 229-30.)

- Dr. Barry Turner reviewed all of the information on appeal, recommending "[Hayes] is capable of performing light full-time duty work without further restrictions and limitations as long as he remains at that level of labor and has the ability to change positions at will and as necessary. (AR at 131-32.)

Thus, Hartford's decision that Hayes is *medically* able to perform sedentary/light work was correct on *de novo* review of that decision.

The heart of the dispute, however, is whether plaintiff has the *intellectual* capacity to perform "any occupation." Corey Welch, Hartford's 30(b)(6) representative and appeals specialist, testified that Hartford claims managers use the "60% of predisability indexed earnings" as an "administrative guide" in an effort to provide claimants a reasonable source of income. (Welch Dep. at 23-24.) Hartford in fact utilized this 60% benchmark in identifying three positions for which Hayes might be qualified – loading inspector, truck safety inspector, and perishable freight inspector. (AR at 308-09.) Plaintiff's argument is, essentially, that since the vocational report completed by Elliott concludes that Hayes possesses only 4th grade reasoning skills, he is not qualified to perform these three positions (the definition of which require minimum 7th-8th grade reasoning skills) and therefore he is disabled

from "any occupation" and Hartford's decision to deny benefits was wrong.  (See

Doc. #32 at 16-19; see also Doc. #22 at 17.)

> 2.    Hartford was correct in deciding that Hayes possessed the
> intellectual capacity to perform unskilled occupations consistent
> with the occupational qualifier test.

The following evidence is undisputed:[8]

- On his application for LTD benefits, plaintiff stated that he had a 10th grade education.  (AR at 671.)

- After high school, plaintiff worked as a truck driver, delivering mobile homes from factory to dealer lots.  (AR at 225.)

- Plaintiff began working for Wal-Mart in 1989 as a truck driver throughout the Southeast in an approximate 500-mile radius from Cullman, Alabama.  (AR at 224-25.)

- Hayes said that the reason he was prevented "from returning to my own or any occupation [is] because I experience too many bad days and I experience chronic back, hip, and leg pain to a level 10.  I can not lift and carry anything over 10 pounds in weight.  I can not stand, sit, or walk for extended periods of time."  (AR at 770.)

- During the in-person interview with a Hartford representative, the interviewer noted that plaintiff was "able to understand the questions

---

[8] As noted earlier, the parties have filed cross motions for summary judgment.  (See Docs. #18, 20.)  Each motion contends that no material facts are in dispute.  In fact, the parties agree that the administrative record, and facts available to Hartford at the time the decision to deny benefits were made, encompass the scope of this court's review.  Therefore, that one doctor opines Hayes *is* mentally capable of performing "any occupation" while another opines that Hayes *is not* so capable does not create a question of material fact as contemplated by Rule 56 of the Federal Rules of Civil Procedure.  It is undisputed that each doctor held the opinion as reflected within the administrative record.  What is in dispute is whether Hartford gave proper weight and review to the competing opinions.

and provide cogent responses to questions.  Mr. Hayes was able to effectively review and edit both of his statements."  (AR at 799.)

- When asked about his ability to read during the interview, plaintiff admitted he could read without restriction or limitation.  (AR at 802.)

- Plaintiff's cognitive abilities are not significantly compromised due to his medication.  (AR at 131-32, 194.)

- Hayes continues with a Commercial Driver's License.  (AR at 224, 228-29.)

- Plaintiff is at the borderline range of intellectual functioning, and at the 8th percentile rank.  (AR at 229-30.)

- Plaintiff is currently reading at a 4th grade level of ability.  (AR at 229-30.)

- Plaintiff's intellectual and educational background limit him to unskilled to no greater than low-end semi-skilled work, the vast majority of which is physically demanding and/or is production based work set in industrial or factory setting.  (AR at 229-30.)

- Each of the Attending Physicians who evaluated plaintiff's condition indicated that plaintiff was capable of handling his own finances and was competent to endorse checks and direct the use of the proceeds thereof.  (AR at 368, 583, 597, 678, 715.)

- During the initial stage of his disability, plaintiff performed office work for Wal-Mart including answering the phone and other administrative work.  (AR at 639.)

On *de novo* review, the overwhelming weight of this evidence indicates that Hayes has the experience, mental capacity, and training to work in unskilled occupations other than truck driver.  Although Thomas Elliott, a Licensed Professional Counselor,

31

Rehabilitation and Vocational Expert, and Registered Psychometrist, performed testing which indicated that Hayes possessed borderline intellectual functioning and was reading at a 4th grade level of ability,[9] those findings belie Hayes' intellectual capacity to drive trucks throughout the Southeast for ten years and maintain a Commercial Driver's License even to this day.   In fact, when conducting the employability analysis, Hartford's rehabilitation case manager looked specifically at the profiles of plaintiff's previous occupations, Tractor-Trailer-Truck Driver[10] and Escort-Vehicle Driver.  (AR at 311-12.)  All three identified occupations of loading inspector, truck safety inspector, and perishable-freight inspector *have the very same requirements for reasoning, mathematics and language as plaintiff's previous occupations*, and, in fact, the truck safety inspector occupation has a less onerous language requirement than his previous occupations.  (See Doc. #33 at 19; see also Doc. #39 at 2-3.)

Armed with overwhelming evidence attesting to Hayes' mental capacity to perform unskilled work which would earn him approximately 60% of his predisability indexed earnings, Hartford was under no obligation to perform additional IQ or

---

[9] Contrary to plaintiff's argument otherwise, Hartford did not ignore plaintiff's creditable evidence in order to cut off benefits.  (See Doc. # 32 at 18 and AR at 64-67.)

[10] Elliott agreed that plaintiff's prior occupation was best described by the DOT as Tractor-Trailer-Truck Driver.  (AR at 225.)

vocational testing.  See Archible v. Metropolitan Life Ins. Co., 85 F. Supp.2d 1203, 1220 n. 13 (S.D. Ala. 2000) ("We hold that consideration of vocational evidence is unnecessary where the evidence in the administrative record supports the conclusion that the claimant does not have an impairment which could prevent him from performing some identifiable job.  The plan administrator is not required in every case where the 'any occupation' standard is applicable to collect vocational evidence in order to prove there are available occupations for the claimant."); see also Hufford v. Harris Corp., 322 F. Supp. 2d 1345, 1359 (M.D. Fla. 2004) ("When, as here, the claimant's previous employment was not highly skilled or technical, the plan administrator need not conduct a vocational assessment or consider vocational evidence to determine that the claimant is disabled under the 'any occupation' standard").  In fact, "rehabilitation case managers are able to draw conclusions from other information about how education and work history would support a level of mental capacity."  (Welch Dep. at 44, 61.)  It was plaintiff's burden to demonstrate his continuing disability from "any occupation" due to mental capacity.  See Farley v. Benefit Trust Life Ins. Co., 979 F.2d 653, 658 (11th Cir. 1992).  His failure to do so was not Hartford's burden.  See Hufford, 322 F. Supp. 2d at 1360 ("The Plan participant seeking to challenge [the plan administrator's] denial of benefits [] must demonstrate that he was entitled to receive the residual disability benefits under the

terms of the Policies").

Thus, Hartford was *de novo* correct to conclude that Hayes possessed the intellectual capacity to perform "any occupation."

### B.  Because Hartford's Decision to Deny Benefits was *De Novo* Correct, the Inquiry Ends and Hartford Prevails.

Under *de novo* review, this court has determined that the decision to deny benefits was correct.  See Williams, 373 F.3d at 1138.  Therefore, Hartford prevails.  See id.  There is no reason for the court to advance to the next step in analyzing the claim for benefits.[11]  See id.

## V.  CONCLUSION

For the reasons asserted above, the Motion for Summary Judgment by Hartford Life and Accident Insurance Company (doc. #20) is due to be granted and Plaintiff's Motion for Summary Judgment (doc. #18) is due to be denied.  A separate order will be entered.

**DONE** this the ___15th___ day of May, 2007.

_James H. Hancock_

SENIOR UNITED STATES DISTRICT JUDGE

---

[11] See discussion, supra, Section IV.B.

34